# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KEVIN MCMILLAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 14-CV-717-GKF-FHM |
| | ) | |
| AT&T UMBRELLA BENEFIT | ) | |
| PLAN NO. 1, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Kevin McMillan brings this suit under the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et seq.* ("ERISA"), seeking judicial review of the denial of his claim for short-term and long-term disability under the AT&T Umbrella Benefit Plan No. 1. McMillan contends that the plan administrator denied his claim without considering his ability to perform the cognitive and travel requirements of his position.  For the reasons set forth in this opinion and order, the court agrees that the administrator denied McMillan's short-term disability claim based on an incomplete understanding of his job duties and, consequently, that its decision was arbitrary and capricious.

### I.      Background

McMillan began working for AT&T Corp. ("AT&T") on or about August 13, 2007.  As an employee of AT&T, McMillan received short term disability ("STD") insurance under the AT&T Disability Income Benefit Program, a component of the AT&T Umbrella Benefit Plan No. 1.  As relevant here, the plan provides that an employee is considered disabled "when, because of Illness or Injury, [the employee is] unable to perform all of the essential functions of

[his or her] job or another available job assigned by [his or her] Participating Company with the same full-time or part-time classification for which [the employee is] qualified." [AR15].[1] During the time relevant to this case, the plan administrator for the AT&T Disability Income Benefit Program was Sedgwick Claims Management Services, Inc. ("Sedgwick").

On April 25, 2013, McMillan initiated a claim for STD benefits. [AR72]. At the time, he worked as a senior IT client consultant. [AR176]. He estimated that his first day of absence would be June 1, 2013, but subsequently revised that date to May 14, 2013. [AR76]. In reporting his claim, McMillan complained of sleep apnea, diabetes, stage III kidney disease, shortness of breath, chronic obstructive pulmonary disease, inability to walk or stand for long periods of time, and an inability to focus, concentrate, and retain short-term memory. [AR72].

By letter dated April 25, 2013, Sedgwick acknowledged receipt of McMillan's claim and informed him of the need to submit medical information to substantiate his disability. [AR129]. In response, McMillan executed and returned a form authorizing release of his health information to Sedgwick. [AR165].

On May 23, 2013, Sedgwick contacted McMillan via telephone to verify information regarding his claim, including his job duties. Based on their conversation, Sedgwick recorded McMillan's job duties as "[s]edentary; sitting, talking, typing." [AR83].

Shortly thereafter, McMillan's physician, Dr. Terence Grewe, sent Sedgwick an Initial Physician Statement and a patient visit note from May 14, 2013. The statement listed McMillan's current diagnoses as coronary disease, type-two diabetes, hypertension, and sleep apnea, and his functional restrictions as excessive fatigue and sleep problems. [AR171]. A typed list accompanying the statement identified several issues as affecting McMillan's job

---

[1] References to AR refer to the Administrative Record, found at Dkt. #20. Page numbers given refer to the Bates numbering in the lower right hand corner of each page.

performance, including extreme daytime fatigue, lack of concentration, poor memory, inability

to multitask, difficulty with complex problem-solving, back and leg pain with little exertion,

shortness of breath, and inconsistent sleep (usually less than three hours of continuous sleep and

then trouble getting back to sleep).  [AR172].  On the patient visit note, Dr. Grewe noted that the

plaintiff's symptoms included a "[l]ikelihood of falling asleep during the day."  [AR173].

Upon receipt of Dr. Grewe's records, two Sedgwick claim representatives reviewed the

information and concluded that it "lack[ed] significant observable clinical findings to approve

benefits at [that] time."  [AR90].  The representatives further concluded that the case should be

forwarded to an independent Physician Advisor ("PA") for review and consideration.  [AR90].

Sedgwick referred McMillan's claim to Network Medical Review Co., Ltd. ("NMR").

[AR91].  The referral described plaintiff's job duties as sedentary, involving prolonged sitting,

talking, and typing.  [AR91].  NMR assigned Dr. David Hinkamp to review the claim. After

reviewing Dr. Grewe's records, Dr. Hinkamp concluded that "[t]here [were] insufficient

objective medical findings to" conclude that McMillan was unable "to perform sedentary job

duties."  [AR92–93].  Sedgwick reviewed and approved Dr. Hinkamp's conclusions.  [AR96].

By letter dated June 12, 2013, Sedgwick formally advised McMillan that it was denying his STD

claim, noting that "[t]here were no abnormal observable findings from [his] office notes received

05/30/2013 to show limitations preventing [him] from performing [his] job duties."  [AR187].

McMillan timely appealed the denial of his STD claim.  In his appeal letter, he asserted

that he was "unable to perform all of the essential functions of his job as Senior IT Consultant or

another available job assigned by a participating company due to severe sleep apnea and

resultant cognitive dysfunction."  [AR232].  The letter included a more detailed description of

plaintiff's job duties as well as additional medical records in support of his claim.  [AR233-37].

Those records included of the following:

- An April 22, 2013, patient visit note from Dr. Grewe, noting that McMillan had reported increased shortness of breath with minimal exertion, dyspnea while walking, and daytime somnolence.  [AR391].
- An April 30, 2013, patient visit note from Dr. Grewe, noting that McMillan had reported no improvement in his breath and referring him to pulmonologists, Dr. Richard Bregman and Dr. Grace Kennedy.  [AR395-98].
- A June 17, 2013, patient visit note from Dr. Grewe, noting that McMillan reported continued dyspnea while walking, weakness, and daytime somnolence.  Dr. Grewe rated McMillan as a twenty-two (22) on the Epworth Sleepiness Scale ("ESS"),[2] and recorded the following information under the heading "Discussed": "Even if could physically go back to work, cannot focus enough to adequately perform work tasks."  [AR403-405].
- A June 18, 2013, echocardiogram report on McMillan, stating, "The wall motion of the entire left ventricle is mildly hypokinetic.  The left ventricle is normal sized and mildly hypertrophied and has normal diastolic function, an EF of 45-50% and mildly reduced systolic function. Trace mitral regurgitation. Trace tricuspid regurgitation."  [AR470].
- A June 19, 2013, pulmonary rehab assessment for McMillan.  The lung function test returned a normal result at seventy-six (76) percent.  McMillan could not complete the six minute walk test because of leg pain.  Moderate dyspnea resulted from his five minutes of exertion.  [AR473].
- A September 17, 2013, sleep study by Dr. Brent Stevenson, confirming McMillan's earlier diagnoses of obstructive sleep apnea and hypopnea syndrome.  [AR477-82].
- A September 19, 2013, neuropsychological assessment by Dr. Sharna Wood, detailing her interview of McMillan as well as his results on a variety tests.  [AR484-97].  Dr. Wood summarized her findings and opinions as follows: "Examination of Kevin's performance on various measures reveals that at the time of this evaluation he was functioning in the superior range in academic and intellectual testing, but in the average range on tests of memory, visuospatial analysis and executive functioning; in the below range in attentional processing and in the mildly impaired range in language functioning.  This pattern of test scores is indicative of disruptions in his cognitive ability."  [AR497].  Dr. Wood attributed McMillan's cognitive

---

[2] The ESS is a self-administered questionnaire designed to measure a person's general level of daytime sleepiness.  The ESS asks people to rate, on a 4-point scale (0–3), their usual chances of falling asleep in eight (8) different situations.  The total ESS score can range between 0 and 24.  The higher the score, the higher the person's level of daytime sleepiness.  *See What the Epworth Sleepiness Scale is and How to Use It*, The Epworth Sleepiness Scale, http://epworthsleepinessscale.com/about-epworth-sleepiness/ (last visited Feb. 2, 2016).

> dysfunction to oxygen deprivation caused by sleep apnea and obstructive pulmonary hyperextension. [AR497].

- McMillan's patient records from the Warren Clinic from August 1, 2010, to August 13, 2013, detailing his diabetes diagnosis and treatment. [AR499-541]. The records included a December 17, 2012, office visit note from Dr. David W. Harris, noting that McMillan had reported "[d]ifficulty with mentally focusing on work tasks" and was "considering STD." [AR516].

- McMillan's medical records from Dr. Bregman from June 2010 to August 2012, concerning his daytime somnolence and sleep apnea. [AR543-50]. The records included an August 28, 2012, sleep study report, noting that McMillan's ESS was "persistently abnormal at 18 and [that] he [was having] difficulty concentrating and complain[ed] of daytime somnolence." [AR548]. Dr. Bregman summarized his findings from that sleep study as follows: "In summary, this sleep study was severely positive for obstructive sleep apnea syndrome with hypoxemia and snoring present. These findings are significantly increased from 2010." [AR549].

- A June 24, 2013, office visit note from Dr. Kennedy, noting that McMillan suffered from obstructive sleep apnea and could "only walk a block or two without having significant pain." [AR569]. The note listed the following laboratory data: "The patient has mild restrictive physiology. His forced vital capacity is 67%, 2.95 liters. His FEVI is 2.64 liters, 77%. However, his diffusion coefficient was 80% of predicted indicating that his restriction is more related to body habitus than actual interstitial lung disease process." [AR570].

- A February 28, 2013, Physician Outpatient Medication Assessment conducted by Dr. Kaitlin A. Bullock, regarding McMillan's depression and anxiety. As detailed in the Assessment, McMillan reported "experiencing anxiety and depression because of decreased ability to perform at his job designing computer systems." In particular, McMillan complained of difficulty concentrating, memory loss, and trouble multi-tasking. [AR616].

In addition to his medical records, McMillan's appeal letter also included medical journal articles discussing the link between sleep apnea and cognitive impairment. [AR639-722].

Upon receiving the appeal, Sedgwick contacted plaintiff's former supervisor,[3] Robert Burton, to obtain plaintiff's "formal job description." [AR278]. Burton responded as follows:

> Works as a consulting team member or an individual functional software consultant on life-cycle product implementation, upgrades enhancement, integration, or audit projects. Expertise and work efforts focus primary on the implementation of PeopleSoft software products including requirements, planning, development, implementation, support and documentation. Duties

---

[3] AT&T terminated McMillan's employment on September 13, 2013. [AR 104].

sometimes performed at customer's site.  May support pre-sales specialist when needed.  Operates under minimal supervision on medium to large size projects involving multiple products and/or platforms.

No physical requirements other than associated travel on occasion (if any).  It is a cognitive position as it requires memory and thought about software installation, setup and client interaction.  He was categorized a full-time telecommuter working from home—when not at a client site.

[AR278].  When asked for more information about the travel requirements of plaintiff's position,

Burton replied, stating,

Travel was random based on the project work sold.  Generally it was project work at a client out of state which would require air travel.  There is no predetermined travel distance as he could be in Atlanta for a project for some time—and then in Chicago after that (for example).  Generally our consultants travel around 20% of the time, but could increase to 100% based on the project need and statement of work.  And in some cases a year would go by where no travel was needed. When not travelling he worked from home.

[AR277].

On January 8, 2014, Sedgwick referred McMillan's appeal for external review by PAs

with specialties in internal medicine, endocrinology, pulmonology, and neurology.  [AR 281].

Each PA was asked to address, among other things, whether McMillan was disabled from his

regular job from May 21, 2013, through August 25, 2013, as well as how the clinical findings in

his medical records could impact his ability to function.  [AR283].  The referral form directed the

PAs to see the "detailed job duty description included in the file."  [AR281].  The file provided

to the PAs for review included the following: the referral form [AR284-86], plaintiff's health

information authorization [AR287-88], plaintiff's appeal letter [AR289-307], the December 11,

2013, JURIS note regarding the initial appeal file review [AR308], Burton's January 8, 2014,

email providing McMillan's formal job description [AR309-11], the JURIS notes for McMillan's

claim [AR312-48], medical records from Dr. Grewe submitted in support of McMillan's initial

6

STD claim [AR349-55], and the medical records, personal statement, letters of support, and medical journal articles submitted in support of McMillan's appeal [AR356-764].

NMR assigned four PAs with different specialties to review McMillan's appeal:  Dr. Jose Perez (internal medicine), Dr. Vincent Valentine (pulmonology), Dr. Charles Brock (neurology), and Dr. Lyle Mitzner (endocrinology).  Each of the PAs reviewed the file and submitted reports to Sedgwick on January 15, 2014.  [AR1192-1214].  Each PA found that McMillan was not disabled from his regular job for the period in question.  [AR1192-1214].

Dr. Perez provided an internal medicine review.  [AR1195].  He noted that McMillan suffered from chronic kidney disease, diabetes, hypertension, and hyperlipidemia, but opined that none of those conditions were so severe as to prevent him from performing his job duties for the relevant period.  [AR1197].  In discussing McMillan's medical file, Dr. Perez noted that he had read the notes and reports of Drs. Harris, Kennedy, and Wood, but stated that such records concerned matters "outside of [his] area of expertise."  [AR1195-96].

Dr. Valentine reviewed McMillan's appeal from a pulmonary perspective.  Dr. Valentine noted that plaintiff had a normal heart and lung exam during his April 22, 2013, visit with Dr. Grewe and that plaintiff's June 24, 2013, echocardiogram showed no pulmonary hypertension or diastolic dysfunction.  [AR1201].  Based on this and other information, Dr. Valentine opined that he saw "no evidence of disability," "[f]rom a pulmonary perspective." [AR1202].  In doing so, he acknowledged that plaintiff had complained of impaired concentration and had undergone a formal neuropsychological evaluation.  The doctor, however, described those matters as "beyond [his] scope."  [AR1202].

Dr. Brock reviewed McMillan's appeal from a neurological perspective.  In doing so, he provided a detailed account of plaintiff's medical records and stated that plaintiff's "[j]ob duties

[were] listed as sedentary with sitting, typing and talking requirements." [AR1206]. With regard to Dr. Wood's neuropsychological assessment, Dr. Brock noted that although such records indicate "cognitive abnormality," they did "not demonstrate how the particular areas of abnormal cognitive testing specifically demonstrate[ed] a severity that would directly impact and cause restrictions and limitations from the noted vocation." [AR12908]. Based on the information provided, Dr. Brock opined that from a neurological perspective McMillan was not disabled during the time in question. [AR1207].

Finally, Dr. Mitzner reviewed McMillan's appeal from an endocrinology perspective. In conducting his review, Dr. Mitzner spoke personally with Dr. Grewe and Dr. Harris. [AR1211]. Dr. Grewe stated "that the main issue with [plaintiff was] concentration," which he attributed to sleep apnea. [AR1211]. Dr. Grewe further stated that he thought plaintiff's "diabetes was contributing in someway to [his] concentration and cognitive issues," but that it was not the main cause. [AR1211]. As for Dr. Harris, he told Dr. Mitzner that "[h]e did not think that there was anything related to diabetes that was impacting [McMillan's] ability to function." [AR1211]. Based on this and other information, Dr. Mitzner opined that plaintiff's diabetes was "poorly controlled," but that he did not have "any symptoms that would prevent functionality or decrease functionality during" the relevant period. [AR1213]. Dr. Mitzner thus concluded that McMillan was not disabled from an endocrinology perspective. [AR1212].

After receiving these four reports, Sedgwick sought a cumulative review of the records from a fifth PA, Dr. Steven Channick. [AR111, 1239]. Dr. Channick reviewed McMillan's appeal from an internal medicine perspective. [AR111, 1239]. The doctor's report provided a detailed summary of McMillan's medical history. As to Dr. Wood's neuropsychological assessment, Dr. Channick noted that McMillan's "pattern of test scores [were] indicative of [a]

disruption in cognitive ability," but stated that such matters were "outside [his] area of expertise." [AR1247]. Based on his review of plaintiff's medical files, Dr. Channick ultimately concluded that McMillan was not disabled "[f]rom an internal medicine perspective." [AR1248]. Notably, Dr. Channick's conclusion was premised only on his evaluation of plaintiff's diagnoses for stage II kidney disease, hypertension, and hyperlipidemia, none of which, he concluded, were disabling. [AR1248].

Shortly thereafter, Sedgwick forwarded the five PA reports to plaintiff's counsel and invited counsel to submit any additional medical records if desired. [AR1251]. In response, counsel submitted a rebuttal statement from Dr. Wood as well as additional records from plaintiff's cardiologist, Dr. John Roye. [AR1317]. Dr. Wood's letter read, in relevant part, as follows:

> Dr. Charles Brock, a neurologist, conducted a review of the medical records of my patient, Mr. Kevin McMillan May 31, 2011. To his credit, Dr. Brock only spoke to how each of the records he reviewed would be perceived, "from a neurological perspective," attesting to his ethical responsibility to remain within his trained field of expertise. . . .
>
> Although to a layperson they seem very similar, neurology and neuropsychology are very different disciplines. To illustrate this, consider the brain as a computer for a moment. The neurologist would be concerned with the physical body—the hardware—asking questions such as, "Are all the parts there and connected? Is the unit plugged in? Is it turned on" If so, then, "from a neurological perspective," everything should be in working order. The tools of neurology, such as neuroimaging scans, are very useful in taking beautiful pictures of what the brain looks like, determining structural abnormalities, tumors, atrophy, et cetera, but within the hour of the neurology consult, only gross abnormalities can be discovered. Attention, memory, language, visuospatial skills and executive functioning cannot be properly evaluated with the ubiquitous Mini Mental Status Exam. Indeed, the MMSE is so insensitive and lacks specificity to such a degree that by the time that instrument detects a problem, everyone but the patient knows the patient is impaired. . . .
>
> Using the same illustration of the brain as a computer, the neuropsychologist would be concerned with the software, asking questions such as, "The parts are all there and connected, so why isn't it working properly?" The tools of neuropsychology demonstrate how information is getting into, processed by, and back out of the brain via the neuropsychological assessment process,

which in a case such as Mr. McMillan, requires an entire day, sometimes two, depending on the referral question.  Such a testing day is exhausting both for the patient and the clinician, but the benefit to such rigorous assessment is that doing so can detect even subtle changes in cognitive functioning which can be compared to previous levels of functioning to pinpoint exactly which domains are affected and to what degree.  The tests are highly sensitive and specific to each domain, and as such provide a more comprehensive view of how the individual patient's brain is actually working.  In addition to cognitive testing, neuropsychologists also regularly administer tests that detect malingering or feigned poor effort, neither of which were found in Mr. McMillan's case.

Mr. McMillan has always been a high functioning individual, based upon his interests as well as his academic and occupational attainment.  Because his intellectual functioning was so high, had he not been experiencing cognitive dysfunction, his neuropsychological testing would have been similarly elevated, but due to his chronic hypoxia it was clear that he is experiencing some cognitive dysfunction that is impairing his ability to work—particularly at such a cognitively demanding position as his last.

. . . Short term oxygen deprivation (hypoxia) can cause disorientation and confusion, as we may experience when we visit somewhere in high elevation areas such as a ski resort, but the body recovers quickly once it travels closer to sea level.  Long term, chronic hypoxia, can cause damage throughout the body, and even death, with the most vulnerable systems being those most evolutionarily recent, such as the frontal lobe of the brain—which controls the cognitive domains of attention and executive functioning.

In addition to rest, the purpose of sleep is to restore and repair cells.  In the case of sleep apnea, during which the patient stops breathing often hundreds of times per night, the restorative and repairing process is inhibited due to lack of oxygen.  The scientific literature dating back to the early 1970's overwhelmingly supports the notion that the chronic hypoxia caused by sleep apnea causes cognitive dysfunction, particularly in the domains of memory, attention, and executive functioning, such as Mr. McMillan exhibited in his testing with me.

Finally, and most curiously, every professional who has actually spent time with Mr. McMillan, corroborated by several ancillary reports from family and friends, agree that he is suffering numerous impairments when compared to his functioning prior to his illness.  The only professional who disagrees appears to be Dr. Brock, who from what I have ascertained in his report has never met Mr. McMillan, and for whom the extent of his contact has been merely to review the medical records through the lens of a "neurological perspective," whether those records were related to his specialty or not.

[AR1329-30].

As for Dr. Roye, his submissions consisted of medical records on McMillan and a letter

dated March 28, 2014.  The letter stated that McMillan had undergone a heart catheterization on

March 4, 2014, "which revealed he had small vessel coronary disease that [was] not amenable to intervention or grafting." [AR1352].  Based on this diagnosis, Dr. Roye opined that McMillan was "totally and permanently disabled." [AR1352].

Sedgwick sent McMillan's additional submissions to NMR and requested the five PAs prepare addendum reports.  Each of the five PAs (of their substitutes) reviewed the additional information and submitted their addendum reports to Sedgwick on April 11, 2014.  Each PA affirmed his original conclusion that McMillan was not disabled.

Dr. William Mazzella completed the addendum report for Dr. Perez.  [AR1359-61].  Although his review was conducted without the benefit of McMillan's job description, Dr. Mazzella nonetheless concluded that plaintiff's additional information did not support altering Dr. Perez's original opinion, because the information "was recent" and did not concern plaintiff's medical status for the relevant period (May 2013 to August 2013).  [AR1360].

Dr. John Gefland completed the addendum report for Dr. Valentine.  [AR1366-67].  Reviewing from a pulmonary perspective, Dr. Gefland concluded that plaintiff's additional records did not support altering Dr. Valentine's original opinion:

> The additional medical records do not present any new information relating to lung disease that would alter the opinion of the previous pulmonary reviewer. The claimant has obesity, sleep apnea, heart disease, diabetes related eye disease and cognitive deficits.  He has had normal lung examination and pulmonary function testing in the past that has revealed a restrictive defect consistent with his obesity and not attributable to intrinsic lung disease, a conclusion supported by normal diffusing capacity noted in the initial pulmonary review.  He has sleep apnea but that is not an intrinsic lung disease.  The original pulmonary determination should be upheld.

[AR1367].

Dr. Mitzner completed his own addendum report.  [AR1362-63].  Reviewing from an endocrinology perspective, Dr. Mitzner concluded that plaintiff's additional information did not

support altering his original opinion because such information was "not relevant to patient's

diabetes." [AR1363]. In doing so, the doctor reinterred that his review was limited to matters of

endocrinology and that plaintiff's other medical concerns were "deferred to the appropriate

specialty." [AR1363].

Dr. Brock also completed his own addendum report. [AR1365-64]. Reviewing from a

neurological perspective, Dr. Brock affirmed his original opinion:

> The additional medical information does not alter my previous medical opinion,
> which is provided from a neurologic perspective. Again, the available medical
> records provided for review do not detail any specific objective neurologic
> abnormality in regard to motor, sensory, reflex, coordination, or cranial nerves
> function. While the available medical records report abnormalities of cognition
> from the neuropsychologist [Dr. Wood], the opinion regarding any neurocognitive
> ability is deferred to a behavioral cognitive specialist and is not included as part of
> my assessment from a neurologic perspective.

[AR1365].

Finally, as for Dr. Channick, he too completed his own addendum report, affirming his

original opinion:

> The additional information did not alter my previous opinion. . . . The internal
> medicine diagnoses were stage II kidney disease, hypertension and
> hyperlipidemia. The updated notes were from ophthalmology, cardiology and
> neuropsychology. His blood pressure was stable on these visits. His ankle
> brachial index was noted to not be significant bilaterally. The remainder of the
> evaluations is outside my area of expertise.

[AR1357].

By letter dated May 5, 2014, Sedgwick notified McMillan that his appeal was denied.

[AR1371-74]. The denial letter summarized the findings of each PA and stated that "[a]lthough

some findings are referenced, none are documented to be so severe as to prevent [McMillan]

from performing the duties of his job as a Senior IT Client Consultant with or without reasonable

accommodation from May 21, 2013 through August 25, 2013." [AR1373].

On May 16, 2014, McMillan called Sedgwick and inquired about filing a claim for long-term disability ("LTD") benefits.  Sedgwick advised McMillan that an employee must first receive STD benefits before being eligible for LTD and that, since his STD appeal had been denied, he was entitled to seek judicial review of that decision under ERISA.  [AR127].

## II.   Discussion

"Where, as here, an ERISA plan grants a plan administrator or a delegate discretion in interpreting the terms of, and determining the grant of benefits under, the plan, [the court is] required to uphold the decision unless arbitrary and capricious." *Adamson v. Unum Life Ins. Co. Of Am.*, 455 F.3d 1209, 1212 (10th Cir. 2006).  "Under the arbitrary and capricious standard of review, [the court] will uphold an administrator's decision so long as it is predicated on a reasoned basis." *Graham v. Hartford Life & Acc. Ins. Co.*, 589 F.3d 1345, 1357 (10th Cir. 2009) (internal quotation marks omitted).  "Indicia of arbitrary and capricious decisions include lack of substantial evidence, mistake of law, bad faith, and conflict of interest by the fiduciary." *Hancock v. Metro. Life Ins. Co.*, 590 F.3d 1141, 1155 (10th Cir. 2009).

Here, McMillan claims that Sedgwick's decision was arbitrary and capricious because it failed to consider his ability to perform the travel and cognitive requirements of his position as a senior IT client consultant.  In response, Sedgwick does not deny that these functions are an essential part of McMillan's job, but rather contends that the PA reports on which it relied adequately considered them.  It points to the fact that McMillan's formal job description was included in the file provided to the PAs for review, [AR309-11], and that its referral form directed the PAs to see the "detailed job duty description included in the file," [AR281].  Because the PAs were provided with, and directed to consider, the full range of plaintiff's job

13

requirements, Sedgwick maintains that their conclusions necessarily include consideration of

McMillan's ability to perform the cognitive and travel requirements of his position.

In assessing these arguments, the court begins, as it must, with the text of the plan.  As

relevant here, the plan provides that an employee is totally disabled if "because of Illness or

Injury, [he or she is] unable to perform all of the essential functions of [his or her] job."  [AR15].

When an ERISA plan defines disability in such terms, "it is essential that any rational decision to

[deny] disability benefits . . . consider whether the claimant can actually perform [his or her]

specific job requirements."  *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 855 (3d Cir. 2011).  Thus,

courts have recognized that a denial of benefits is arbitrary and capricious if premised on medical

reports which fail to consider one or more of the claimant's essential job functions.  *See Caldwell*

*v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1285 (10th Cir. 2002); *McDonough v. Aetna Life Ins.*

*Co.*, 783 F.3d 374, 380 (1st Cir. 2015); *Miller*, 632 F.3d at 854-55; *Elliott v. Metro. Life Ins. Co.*,

473 F.3d 613, 619 (6th Cir. 2006).

Based on this authority, the court agrees with the plaintiff.  In denying STD benefits,

Sedgwick relied exclusively on the reports of its PAs, none of which expressly considered

McMillan's ability to perform the cognitive or travel requirements of his position.  Starting with

the cognitive requirements, the only PA to assess McMillan's cognitive abilities was Dr. Brock.

Although Dr. Brock's initial report concluded that McMillan's neuropsychological records did

not reveal a cognitive abnormality so severe as to render him disabled, that report does not

contain any discussion (or recognition) of the cognitive requirements of McMillan's position.

Rather, Dr. Brock described McMillan's "[j]ob duties . . . as sedentary with sitting, typing and

talking requirements."  [AR1206].  Because Dr. Brock's understanding of plaintiff's job

14

requirements was incomplete, it "does not provide substantial evidence that [McMillan] could perform *all* the essential duties of his job."[4]  *Caldwell*, 287 F.3d at 1285 (emphasis in original).

As for the travel requirement, the result is the same.  Neither Sedgwick's denial letter nor the PA reports on which it relied contain any discussion of McMillan's ability to perform the travel duties of his position.  Indeed, at least two of the PAs (Dr. Brock and Dr. Mitzner) described plaintiff's job duties as "sedentary."  [AR1206, 1212].  "On this opaque record, there is simply no way to tell whether the reviewers were applying a correct conception of the [plaintiff's job duties] . . . or some other conception."  *McDonough*, 783 F.3d at 380.  Without such information, the court cannot conclude that Sedgwick's denial of benefits is predicated on a reasoned basis.  *See Caldwell*, 287 F.3d at 1285.

Having determined that Sedgwick's denial of STD benefits was arbitrary and capricious, the court now considers the proper remedy.  Where, as here, a "plan administrator 'fail[s] to make adequate findings or to explain adequately the grounds of its decision,'" the Tenth Circuit has held that ordinarily "the proper remedy 'is to remand the case to the administrator for further findings or explanation.'"  *DeGrado v. Jefferson Pilot Fin. Ins. Co.*, 451 F.3d 1161, 1175 (10th Cir. 2006) (alterations in original omitted) (quoting *Caldwell*, 287 F.3d at 1288).  "A remand for further action is unnecessary only if the evidence clearly shows that the administrator's actions

---

[4]  The inadequacy of Dr. Brock's evaluation is underscored by his addendum report. After confronted with Dr. Wood's rebuttal letter, Dr. Brock clarified that his evaluation was limited to the consideration of plaintiff's "motor, sensory, reflex, coordination, [and] cranial nerve[] function[s]."  [AR1365].  In doing so, he specifically acknowledged that plaintiff's neuropsychological records disclosed cognitive abnormalities, but that such matters were "*not* included as part of [his] assessment from a neurologic perspective" and instead were "*deferred to a behavioral specialist*."  [AR1365 (emphasis added)].

McMillan's claimed disability does not concern his motor, sensory, reflex, coordination, or cranial nerve functions.  Rather, McMillan claims to suffer from cognitive impairment due to oxygen deprivation caused by sleep apnea.  As evidenced by his addendum report, Dr. Brock did not consider this theory of disability.  His report thus does not provide a reasoned basis for concluding that McMillan is capable of performing the cognitive requirements of his position.

were arbitrary and capricious, or the case is so clear cut that it would be unreasonable for the plan administrator to deny the application for benefits on any ground." *Caldwell*, 287 F.3d at 1289 (citation omitted) (internal quotation marks omitted); *accord DeGrado*, 451 F.3d at 1176.

Here, the court concludes that a remand to Sedgwick is the proper course of action. This is not a case where the evidence is so one-sided as to make a remand unnecessary. "Rather, the flaw in [Sedgwick's] decision is that it failed to make adequate factual findings regarding" McMillan's ability to perform certain essential functions of his job. *DeGrado*, 451 F.3d at 1176. The court "will not substitute [its] judgment for that of [Sedgwick]." *Rekstad v. U.S. Bancorp*, 451 F.3d 1114, 1121 (10th Cir. 2006).[5]

WHEREFORE, the court holds that Sedgwick failed to adequately consider McMillan's ability to perform all of his essential job functions before denying his claim for STD benefits. It is therefore ordered that this case is REMANDED to Sedgwick for further proceedings consistent with this opinion.

ENTERED this 9th day of February, 2016.

GREGORY K. FRIZZELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT

---

[5] In his opening brief, McMillan asserts that this case also involves a claim for wrongful denial of LTD benefits. In response, Sedgwick contends that McMillan never applied for LTD benefits, nor did it ever deny such a claim. It thus submits that this case is limited to McMillan's claim for STD benefits. McMillan does not respond to this contention, nor does he offer any argument in support of his LTD claim.

The court agrees with Sedgwick. As evidenced by the record, McMillan never applied for LTD benefits, nor did Sedgwick ever deny such a claim. Rather, McMillan merely inquired about applying for LTD benefits and was told that he must first meet the requirements for STD. [AR127]. Under such circumstances, this case is limited to review of McMillan's STD claim. *See Hedin v. Cingular Wireless, LLC*, No. 04-CV-0406-CVE, 2006 WL 346429, at *1 (N.D. Okla. Feb. 13, 2006); *Schwob v. Standard Ins. Co.*, 37 Fed. App'x 465, 470 (10th Cir. 2002). On remand, should Sedgwick conclude that McMillan is in fact entitled to STD benefits, McMillan may then submit his claim for LTD benefits.